Joseph SOROTA, Plaintiff,

v.

Steven SOSA, Defendant.

Case No. 11–80897–Civ.

United States District Court,
S.D. Florida.

Jan. 31, 2012.

Steven R. Jaffe, Mark S. Fistos, Bradley James Edwards, Farmer Jaffe Weissing Edwards Fistos & Lehrman PL, Fort Lauderdale, FL, for Plaintiff.

Patricia A. Leonard, Gerardo Rodiriguez–Albizu, Greenberg Traurig, P.A., West Palm Beach, FL, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT

KATHLEEN M. WILLIAMS, District Judge.

This MATTER is before the Court on Defendant Steven Sosa's Motion to Dismiss the Amended Complaint [D.E. 29], Plaintiff Joseph Sorota's Response [D.E. 36], and Sosa's Reply [D.E. 38]. This Court held a hearing on the motion on January 19, 2012.

## I. BACKGROUND

Sorota is a 91–year old resident of Palm Beach County, Florida. [D.E. 26 ¶¶ 2, 8]. In his Amended Complaint, he alleges that Sosa, a permanent resident of Peru, is "a professional con man who has through several different and elaborate schemes, defrauded [Sorota] out of large amounts of money." [Id. ¶¶ 1, 9]. Sorota brings seven claims against Sosa, but federal jurisdiction is based solely on Count One, which Sorota brings pursuant to the federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).[1]

Sorota's RICO allegations can be briefly summarized as follows. In 2007, Sorota's grandson was living in Peru and approached Sorota about owning and operating a Peruvian telephone company. [Id. ¶¶ 13–14]. By that time, Sosa had gained Sorota's trust by helping him with his personal affairs in South Florida, and Sosa offered to represent Sorota's interests in Peru. [Id. ¶ 16]. Sosa represented to Sorota that, if Sorota provided the capital, Sosa would manage the business and they would split the profits. [Id. ¶ 23]. The telephone company was incorporated in Peru under the name Sparq Telecommunications Peru SAC ("Sparq"). [Id. ¶ 21].

Sorota alleges that, from July 2009 to August 2010, Sosa, while in Florida, induced Sorota to wire money on 18 separate occasions from a Florida bank account to Sparq's Peruvian bank account for the ostensible purpose of operating the company. However, rather than using the money for its requested purpose, Sosa misappropriated much of the money for his own personal

1. Sorota notably did not bring a RICO claim in his original Complaint, and instead sought to base federal jurisdiction on diversity of citizenship. See 28 U.S.C. § 1332; [D.E. 1 ¶ 7]. After Sosa moved to dismiss the Complaint on the ground that the requirements for diversity jurisdiction were not satisfied [D.E. 19 at 7–10], Sorota filed the instant Amended Complaint abandoning his reliance on the diversity statute and adding a RICO claim. [D.E. 26 ¶ 7].

use in both Florida and Peru. [*Id.* ¶¶ 36–41]. Sosa was apparently able to do so because, initially unbeknownst to Sorota, he had issued 51 % of the shares of Sparq to himself. [*See id.* ¶¶ 29–32].

Apparently not satisfied with 51% ownership in Sparq, Sosa later established a Peruvian company called Sparq International Marketing SAC Peru, in which he was a 90% owner, for the purpose of taking over Sparq's money and property. [*Id.* ¶ 34]. Sosa similarly established another Peruvian company called Telmark Communications EIRL, in which he was a 100% owner, for the purpose of redirecting Sparq's business contracts and profits. [*Id.* ¶ 42].

Under the federal RICO statute, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c). "Under section 1962(c) ..., the [Plaintiffs] must satisfy four elements of proof: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir.2009) (citations omitted). "Any person injured in his business or property by reason of a violation of section 1962" may bring a civil cause of action for treble damages. 18 U.S.C. § 1964(c).

In his RICO Count, Sorota alleges that, by repeatedly inducing Sorota to wire money with fraudulent intent, Sosa engaged in a pattern of racketeering activity. [D.E. 26 ¶¶ 80–81, 84]; *see* 18 U.S.C. § 1961(1)(B) (defining "racketeering activity" to include wire fraud committed in violation 18 U.S.C. § 1343); *id.* § 1961(5) (defining "pattern of racketeering activity" to require at least two predicate acts of racketeering within a ten-year period). He further alleges that Sosa formed an association-in-fact enterprise with Sparq, Sparq International Marketing SAC Peru, and Telmark Communications EIRL. [D.E. 26 ¶¶ 75–76; D.E. 34 at 12, 15]; *see* 18 U.S.C. § 1961(4) (defining "enterprise" to include "any union or group of individuals associated in fact").[2] According to Sorota, this enterprise "provided [Sosa with] the organizational structure and cover to defraud [Sorota] and serve as [the] vehicle for receiving monies from [Sorota] induced by fraud...." [D.E. 34 at 12; *see* D.E. 26 ¶¶ 75, 78, 82].

## II. DISCUSSION

Relying on the Supreme Court's decision in *Morrison v. Nat'l Australia Bank Ltd.*, —— U.S. ——, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010), Sosa moves to dismiss Sorota's RICO claim primarily on the ground that RICO does not apply extraterritorially, and Sorota alleges a foreign (rather than a domestic) RICO enterprise.[3] The Court finds that, "[a]lthough *Morrison* [did] not address the RICO statute, its reasoning is dispositive here." *Cedeño v. Intech Group, Inc.*, 733 F.Supp.2d 471, 473 (S.D.N.Y.2010) (Rakoff, J.).

---

**2.** Although Sorota does not allege in his Amended Complaint that Sparq International Marketing SAC Peru was a member of the RICO enterprise, he does include it in his RICO Case Statement. [D.E. 34 at 12 & n. 4, 15].

**3.** To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead sufficient facts to state a claim that is "plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). All factual allegations are accepted as true and all reasonable inferences are drawn in the Plaintiff's favor. *See Speaker v. U.S. Dept. of Health and Human Servs. Ctrs. for Disease Control and Prevention*, 623 F.3d 1371, 1379 (11th Cir.2010).

## A. Whether RICO Applies Extraterritorially

■ In *Morrison*, the Supreme Court addressed whether § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), prohibiting fraud or deceit in connection with the purchase or sale of securities, had extraterritorial application. In concluding that it did not, the Court reiterated the "longstanding principle of American law that ..., unless there is the affirmative intention of Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions." *Morrison*, 130 S.Ct. at 2877 (internal citations and quotation marks omitted). The Court made clear, in other words, that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Id.* at 2878. And the Court ultimately concluded that, because there was "no affirmative indication in the Exchange Act that § 10(b) applie[d] extraterritorially," it did not have such application. *Id.* at 2883.

Prior cases had erroneously disregarded this principle by interpreting the Exchange Act's silence in this regard as an invitation to "discern whether Congress would have wanted the statute to apply" in specific cases. *Id.* at 2878 (quotation marks omitted). In doing so, those courts typically evaluated whether the fraudulent conduct occurred in the United States, or whether its effects were felt here. The Supreme Court in *Morrison* unequivocally repudiated the so-called "conduct" and "effects" tests as not only incompatible with the presumption against extraterritoriality, but also as lacking any textual basis, resulting in overly complex and unpredictable application, and "essentially resolving matters of policy." *Id.* at 2878–81. The Court concluded that "[t]he results of judicial-speculation-made-law—divining what Congress would have wanted if it had thought of the situation before the court—demonstrate the wisdom of the presumption against extraterritoriality. Rather than guess anew in each case, we apply the presumption in *all cases*, preserving a stable background against which Congress can legislative with predictable effects." *Id.* at 2881 (emphasis added).

Relying on *Morrison*, Sosa argues that, because RICO (like the Exchange Act) is silent with respect to extraterritorial application, it has no such application. Every court to consider this argument after *Morrison* has embraced it. *Norex Petroleum Ltd. v. Access Indus. Inc.*, 631 F.3d 29, 32–33 (2d Cir.2010); *CGC Holding Co., LLC v. Hutchens*, 824 F.Supp.2d 1193, 1207–10, 2011 WL 5320988, at *12–14 (D.Col. Nov. 1, 2011); *In re Le–Nature's Inc.*, 2011 WL 2112533, at *2 (W.D.Pa. May 26, 2011); *In re Toyota Motor Corp.*, 785 F.Supp.2d 883, 913 (C.D.Cal.2011); *United States v. Philip Morris USA, Inc.*, 783 F.Supp.2d 23, 27–28 (D.D.C.2011); *European Cmty. v. RJR Nabisco, Inc.*, 2011 WL 843957, at *4 (E.D.N.Y. Mar. 8, 2011); *Cedeño*, 733 F.Supp.2d at 473.

Nonetheless, the Eleventh Circuit has held in a pre-*Morrison* decision that RICO may apply extraterritorially. *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1351–52 (11th Cir. 2008). This Court is bound by such Eleventh Circuit decisions unless they are subsequently overruled by the Eleventh Circuit sitting *en banc* or by the Supreme Court. *United States v. Kaley*, 579 F.3d 1246, 1255–56 (11th Cir.2009). The issue here is whether the extraterritoriality holding of *Renta* has been overruled—or, more accurately, "undermined to the point of abrogation"—by the Supreme Court's subsequent decision in *Morrison*. *Id.* at 1255 (quoting parenthetically *Chambers v. Thompson*, 150 F.3d 1324, 1326 (11th Cir.

1998)). Reluctantly, the Court concludes that it has.

In holding that RICO may have extraterritorial application, the Eleventh Circuit in *Renta* rejected the contrary position adopted by other courts "that RICO does not apply extraterritorially ... because Congress made no explicit statement to that effect." 530 F.3d at 1351. However, *Morrison* explicitly rejected such reasoning, emphasizing that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." 130 S.Ct. at 2878. Moreover, the Eleventh Circuit in *Renta* held that "RICO may apply extraterritorially if conduct material to the completion of the racketeering occurs in the United States, or if significant effects of the racketeering are felt here." 530 F.3d at 1351–52. However, *Morrison* repudiated the "conduct" and "effects" tests. *See Norex*, 631 F.3d at 32 ("*Morrison* rejected the 'conduct and effect' test traditionally used by the Second Circuit and other courts to determine a statute's extraterritorial application in favor of a bright-line rule: absent a clear Congressional expression of a statute's extraterritorial application, a statute lacks extraterritorial reach."); *Cedeño*, 733 F.Supp.2d at 473 ("*Morrison* also repudiated the ... prior development of an 'effects test' and a 'conduct test.'"). And, while *Morrison* did so in the context of the Exchange Act, its reasoning was not so limited. *See Le-Nature's Inc.*, 2011 WL 2112533, at *2 n. 5 ("[H]aving been rejected with respect to the Securities Exchange Act, the 'effects' and 'conduct' approaches should likewise be rejected, for the same reasons, in the RICO context."); *Philip Morris*, 783 F.Supp.2d at 27–28 ("[T]he Supreme Court [in *Morrison*] intended the presumption against extraterritoriality to apply to *all* statutes, not simply the Exchange Act.... The Government's argument ignores the plain language of *Morrison* and ignores its presumption against territoriality and ac-companying rejection of the 'effects' test."). "Indeed, it would make particularly little sense to confine *Morrison* ['s] proscription against the 'effects' test to the Exchange Act, as RICO's 'effects' test was explicitly borrowed from the Exchange Act context." *Philip Morris*, 783 F.Supp.2d at 28 n. 5. The same is true of the "conduct" test. *See Renta*, 530 F.3d at 1352 (observing that "[t]he conduct test is borrowed from the securities laws").

Thus, the Court concludes that *Renta's* holding that RICO may apply extraterritorially has been undermined to the point of abrogation by the Supreme Court's subsequent decision in *Morrison*. Furthermore, the Court agrees with the post-*Morrison* decisions cited above uniformly holding that RICO does not apply extraterritorially. Accordingly, the Court must now examine whether the RICO allegations in this case in fact exceed the territorial reach of the statute.

## B. Whether Sorota Seeks Extraterritorial Application

After concluding that § 10(b) did not apply extraterritorially, the Supreme Court in *Morrison* addressed the petitioners' alternative argument that they did not seek extraterritorial application. The Court prefaced its analysis by observing that the presumption against extraterritoriality is often "not self-evidently dispositive" because "its application requires further analysis. For it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case." *Morrison*, 130 S.Ct. at 2884.

In determining whether the petitioners sought to apply § 10(b) extraterritorially,

the Supreme Court looked to the "focus" of the Exchange Act. *Id.* at 2884. After examining the statute, the Court determined "that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Id.* at 2884–86. As "the objects of the statute's solicitude," such domestic transactions, the Court concluded, were what "the statute [sought] to regulate" and "protect." *Id.* at 2884 (citations omitted). Thus, in order to determine whether the petitioners sought an impermissible extraterritorial application, the Court adopted a "transactional test" asking whether "the purchase or sale is made in the United States, or involves a security listed on a domestic exchange." *Id.* at 2886.

■ "Applying the same mode of analysis here," this Court must identify RICO's "focus"—or, in other words, the "object of the statute's solicitude," and what it "seeks to regulate" or "protect." *Id.* at 2884. In the wake of *Morrison,* several courts have examined the RICO statute and determined that "the focus of RICO is on the enterprise as the recipient of, or cover for, a pattern of criminal activity." *Cedeño,* 733 F.Supp.2d at 474; *accord Le–Nature's Inc.,* 2011 WL 2112533, at *3; *Toyota Motor Corp.,* 785 F.Supp.2d at 914; *Philip Morris,* 783 F.Supp.2d at 28–29; *European Cmnty.,* 2011 WL 843957, at *5. While one court has asserted that "[t]he focus of the statute is the racketeering activity," *Hutchens,* 824 F.Supp.2d at 1209, 2011 WL 5320988, at *14, other courts have persuasively explained that RICO "does not punish the predicate acts of racketeering—indeed, each predicate act is, itself, a separate crime—but only racketeering activity in connection with an 'enterprise.'" *European Cmnty.,* 2011 WL 843957, at *5; *accord Le–Nature's Inc.,* 2011 WL 2112533, at *3 ("RICO does not prohibit racketeering activities *simpliciter*—indeed, those activities are independently criminalized

by statute—but only as related, in enumerated ways, to an enterprise.") (internal citation and footnote omitted); *Cedeño,* 733 F.Supp.2d at 473 ("RICO is not a recidivist statute designed to punish someone for committing a pattern of multiple criminal acts. Rather, it prohibits the use of such a pattern to impact an enterprise....."). Thus, regardless of where the predicate acts of racketeering occur, "RICO does not apply where . . . the alleged enterprise and impact of the predicate activity upon it are entirely foreign." *Cedeño,* 733 F.Supp.2d at 474.

■ In this case, Sorota alleges a foreign—not a domestic—RICO enterprise. The alleged enterprise consists of Sosa, a permanent resident of Peru, and Sparq, Telmark Communications EIRL, and Sparq International Marketing SAC Peru, three companies located and incorporated in Peru. [D.E. 26 ¶¶ 21, 34, 42]. The role of this alleged enterprise, moreover, was to act as the recipient of, and cover for, Sosa's racketeering activity by receiving and holding the funds that he fraudulently induced Sorota to wire to Peru. Thus, the enterprise operated entirely in Peru, with its only connection to the United States being that the funds it possessed originated from (and possibly returned to) a Florida bank account. Such a limited connection with the United States is insufficient. *See Cedeño,* 733 F.Supp.2d at 472–74 (dismissing a RICO claim as seeking extraterritorial application where the "contacts with the United States . . . were limited to the movement of funds into and out of U.S.-based bank accounts"). While aspects of Sosa's racketeering activity (*i.e.,* the wire fraud) allegedly took place in the United States, "RICO does not apply where, as here, the alleged enterprise and the impact of the predicate activity upon it are entirely foreign." *Id.* at 474; *cf. United States v. Turkette,* 452 U.S. 576, 583,

101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (stating that an enterprise is "an entity separate and apart from the pattern of [racketeering] activity"). In this regard, it is worth reiterating the Supreme Court's observation that "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States," and that "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case." *Morrison,* 130 S.Ct. at 2884.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that Sorota fails to state a RICO claim upon which relief can be granted. *See id.* at 2876–77. Accordingly, the Court **GRANTS** Sosa's motion in this respect, and the federal RICO claim in Count One of Sorota's Amended Complaint is hereby **DISMISSED WITH PREJUDICE.**[4] The Court declines to exercise supplemental jurisdiction over Sorota's remaining state law claims in Counts Two through Seven, 28 U.S.C. § 1367(c), and those claims are **DISMISSED WITHOUT PREJUDICE.** Thus, the Court need not address Sosa's remaining arguments. All pending motions, including Sorota's *ore tenus* motion to conduct limited discovery, are **DENIED AS MOOT,** and all hearings are **CANCELED.** The Clerk is directed to **CLOSE** this case.

---

**4.** The Court dismisses this claim with prejudice because Sorota has already amended his complaint as a matter of course, and the Court finds that the interests of justice do not require leave to amend. *See* Fed.R.Civ.P. 15(a)(1)-(2). As noted above, Sorota failed to include a RICO claim in his Original Complaint. *See supra* note 1. And the Court finds that further amendments to the complaint would be futile in light of the Court's extraterritoriality holding.